**MONTEVERDE & ASSOCIATES PC**
Miles D. Schreiner, Esq.
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
Email: mschreiner@monteverdelaw.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JONATHAN ENGLISH, Individually and on Behalf of All Others Similarly Situated, ) ) ) ) | |
| Plaintiff, ) | Case No. |
| ) | |
| v. ) | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** |
| ADMA BIOLOGICS, INC., ) STEVEN A. ELMS, JERROLD B. ) GROSSMAN, ADAM S. ) GROSSMAN, BRYANT E. FONG, ) DOV A. GOLDSTEIN, ) LAWRENCE P. GUIHEEN, and ) ERIC I. RICHMAN, ) | |
| ) | **JURY TRIAL DEMANDED** |
| ) | |
| Defendants. ) | |

Plaintiff Jonathan English ("Plaintiff"), by his undersigned attorneys, alleges

upon personal knowledge with respect to himself, and upon information and belief

based upon, *inter alia*, the investigation of counsel as to all other allegations

herein, as follows:

## NATURE OF THE ACTION

1.     This action is brought as a class action by Plaintiff on behalf of

himself and the other public holders of the common stock of ADMA Biologics,

Inc. ("ADMA" or the "Company") against the Company and the members of the

Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with ADMA Biologics, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, Regulation G, 17 C.F.R. § 244.100, and 17 C.F.R. § 229.1015(b)(4) in connection with the Proposed Transaction (defined below) between ADMA and Biotest Pharmaceuticals Corporation ("Biotest").

2.     On January 21, 2017, the Board caused the Company to enter into an agreement and plan of purchase ("Purchase Agreement"), pursuant to which the Company will acquire certain assets and assume certain liabilities constituting the therapy business of Biotest (the "Proposed Transaction") in exchange for an aggregate equity interest in ADMA equal to approximately 50% of the issued and outstanding ADMA capital stock[1] (the "Purchase Consideration").

3.     On April 26, 2017, in order to convince ADMA shareholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading Definitive Proxy Statement (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections

---

[1] Consisting of (x) 4,295,580 shares of ADMA common stock representing twenty-five percent (25%) of the issued and outstanding common stock of ADMA and (y) 8,591,160 shares of ADMA non-voting common stock representing the balance of the Biotest Equity Interest, which is convertible into common stock of ADMA upon the occurrence of certain specified events as further described in the Proxy.

14(a) and 20(a) of the Exchange Act.

4.     While Defendants are touting the fairness of the Proposed Transaction to the Company's shareholders in the Proxy and have recommended that shareholders vote to approve the deal, Defendants have failed to disclose certain material information that is necessary for shareholders to properly assess whether the Proposed Transaction is in their best interests, thereby rendering certain statements in the Proxy incomplete and misleading.

5.     In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections for the Company; (ii) valuation information regarding the core assets ADMA will acquire if the Proposed Transaction is consummated; and (iii) the valuation analyses performed by the Company's financial advisor, Raymond James & Associates, Inc. ("Raymond James"), in support of its fairness opinion.

6.     The meeting of ADMA shareholders to vote on the Proposed Transaction is scheduled for May 25, 2017.  It is imperative that the material information that has been omitted from the Proxy is disclosed to the Company's shareholders prior to the forthcoming shareholder vote, so that they can properly exercise their corporate suffrage rights.

7.     For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the

Exchange Act, and Rule 14a-9, Regulation G, 17 C.F.R. § 244.100, and 17 C.F.R. § 229.1015(b)(4). Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to ADMA shareholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

9. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10. Venue is proper in this District under Section 27 of the Exchange Act,

15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) ADMA maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

11.     Plaintiff is, and at all relevant times has been, an ADMA shareholder.

12.     Defendant ADMA is incorporated in Delaware and maintains its principal executive offices in Ramsey, New Jersey. The Company develops, manufactures and intends to commercialize specialty plasma-based biologics for the proposed treatment of Primary Immune Deficiency Disease (PIDD) and the prevention and treatment of certain infectious diseases.

13.     Individual Defendant Adam S. Grossman is, and has been at all relevant times, the Company's President, Chief Executive Officer and a director of the Company.

14.     Individual Defendant Steven A. Elms is, and has been at all relevant times, the Chairman of the Board.

15. Individual Defendant Jerrold B. Grossman is, and has been at all relevant times, a director of the Company.

16. Individual Defendant is Lawrence P. Guiheen is, and has been at all relevant times, a director of the Company.

17. Individual Defendant Bryant E. Fong is, and has been at all relevant times, a director of the Company.

18. Individual Defendant Dov A. Goldstein is, and has been at all relevant times, a director of the Company.

19. Individual Defendant Eric I. Richman is, and has been at all relevant times, a director of the Company.

## CLASS ACTION ALLEGATIONS

20. Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of ADMA (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

21. This action is properly maintainable as a class action because:

a. The Class is so numerous that joinder of all members is impracticable. As of December 31, 2016, there were approximately 12.9 million shares of ADMA common stock outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country. The

actual number of public shareholders of ADMA will be ascertained through discovery;

   b.    There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

> i)    whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Proxy in violation of Section 14(a) of the Exchange Act;
>
> ii)   whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and
>
> iii)  whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading Proxy.

   c.    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

   d.    Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

     e.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

     f.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

     g.     A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

## I.    Overview of the Proposed Transaction

22.    ADMA was incorporated on June 2, 2006 and is headquartered in Ramsey, New Jersey. The Company is a late-stage biopharmaceutical company that develops, manufactures and intends to market specialty plasma-based biologics for the treatment and prevention of infectious diseases. The Company is engaged in the development and commercialization of human plasma and plasma-derived therapeutics. The Company's segments include Plasma Collection Centers, Research and Development, and Corporate. The Company's lead product candidate, RI-002, is intended for the treatment of primary immune deficiency disease (PIDD) and has completed a pivotal Phase III clinical study.

23.     Pursuant to the terms of the Purchase Agreement, Defendants have agreed for the Company to acquire the following core assets from Biologics in the Proposed Transaction: (i) certain assets related to the BPC Therapy Business Unit including (a) an FDA-licensed immune globulin manufacturing and plasma products production facility consisting of two buildings of approximately 126,000 square feet located on approximately 15 acres of land in Boca Raton, Florida (the "Boca Facility"), and the associated real property (other than certain vacant and undeveloped land), (b) the exclusive rights to biologics products Nabi-HB® and BIVIGAM® and the investigational product CIVACIR®, (c) in-process inventory with an agreed-upon value of at least $5 million (the "Included Inventory"), (d) certain other properties and assets used exclusively in the BPC Therapy Business Unit and (e) certain additional assets that relate to both the BPC Therapy Business Unit and Biologic's plasma business, the arrangement with respect to which will be documented in a transition services agreement to be mutually agreed by the parties prior to the closing of the Proposed Transaction (each, a "Purchased Asset" and, collectively, the "Purchased Assets").

24.     Further, Biotest will provide ADMA with cash consideration totaling up to $40 million, consisting of a $12.5 million in cash upon closing, a $15 million unsecured subordinated loan at a six (6%) percent per annum interest rate, and interest only through the life of the loan and final principal payment due in full at

the end of the five-year loan period, along with a firm equity commitment to invest an additional $12.5 million in future equity financings of ADMA.

25.   In exchange, Defendants have agreed the Company will give the following consideration for the above listed assets: (i) Fifty percent of ADMA's capital stock, less one share, consisting of (a) voting common stock equal to 25% of the issued and outstanding common stock of ADMA, and (b) non-voting common stock representing the balance of such 50% equity interest, less one share; (ii) The right for BPC to designate one director and one observer to ADMA's Board of Directors; (iii) ADMA will transfer ownership to BPC of its two wholly-owned plasma centers in Norcross, Georgia and Marietta, Georgia, effective January 1, 2019; and (iv) the right for Biotest AG to maintain its existing distribution rights granted for RI-002 in Europe, Near and Middle East and selected other territories and a right of first offer to BPC for the distribution of potential future ADMA developed plasma based products in the territories.

26.   Given the complexities of the Proposed Transaction, it is imperative that Defendants provide ADMA shareholders with all material information necessary for them to assess the fairness of the deal and the value of the Purchased Assets. However, as set forth in detail below, Defendants have omitted certain material information from the Proxy that is necessary for shareholders to properly

exercise their corporate suffrage rights and make an informed decision concerning whether to vote in favor of the Proposed Transaction.

## II.   The Materially Incomplete and Misleading Proxy

27.   On April 26, 2017, Defendants caused the Proxy to be filed with the SEC in connection with the Proposed Transaction.   The Proxy solicits the Company's shareholders to vote in favor of the Proposed Transaction.

28.   The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.   However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

29.   First, the Proxy fails to provide material information concerning the Company's financial projections.   Specifically, the Proxy provides projections for non-GAAP (generally accepted accounting principles) metrics, including EBITDA and Free Cash Flow[2], but fails to provide line item projections for the metrics used

---

[2] The free cash flow projections included in the Proxy represent cash flows from operating activities, net operating loss tax provisions, capital expenditures and changes in working capital, and are not the same as the unlevered, free cash flow projections that Raymond James utilized in connection with its Discounted Cash Flow Analyses. *See* Proxy 80.

to calculate these non-GAAP measures or otherwise reconcile the non-GAAP projections to the most comparable GAAP measures.

30.    When a company discloses non-GAAP financial measures in a Proxy, the Company must also disclose all projections and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method), of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100.

31.    Indeed, the SEC has recently increased its scrutiny of the use of non-GAAP financial measures in communications with shareholders. The former SEC Chairwoman, Mary Jo White, recently stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as ADMA has included in the Proxy here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors. And last month, the staff issued guidance addressing a number of

> troublesome practices *which can make non-GAAP*
> *disclosures misleading*: the lack of equal or greater
> prominence for GAAP measures; exclusion of normal,
> recurring cash operating expenses; individually tailored
> non-GAAP revenues; lack of consistency; cherry-
> picking; and the use of cash per share data. I strongly
> urge companies to carefully consider this guidance and
> revisit their approach to non-GAAP disclosures. I also
> urge again, as I did last December, that appropriate
> controls be considered and that audit committees
> carefully oversee their company's use of non-GAAP
> measures and disclosures.[3]

32.     In recent months, the SEC has repeatedly emphasized that disclosure

of non-GAAP projections can be inherently misleading, and has therefore

heightened its scrutiny of the use of such projections.[4]  Indeed, on May 17, 2016,

the SEC's Division of Corporation Finance released new and updated Compliance

and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial

measures that demonstrate the SEC's tightening policy.[5]  One of the new C&DIs

---

[3] Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html.

[4] *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

[5] *Non-GAAP Financial Measures, Compliance & Disclosure Interpretations*, U.S. SECURITIES AND EXCHANGE COMMISSION (May 17, 2016), https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

regarding forward-looking information, such as financial projections, explicitly requires companies to provide any reconciling metrics that are available without unreasonable efforts.

33.    In order to make the projections included on page 76 of the Proxy materially complete and not misleading, Defendants must provide a reconciliation table of the non-GAAP measures (EBITDA and Free Cash Flow) to the most comparable GAAP measures.

34.    At the very least, the Company must disclose the line item projections for the financial metrics set forth in footnotes 2 and 3 on page 76 of the Proxy that were used to calculated the non-GAAP measures EBITDA and Free Cash Flow, (*i.e.* EBIT, depreciation and amortization, cash flows from operating activities, net operating loss tax provisions, capital expenditures and changes in working capital). Such projections are necessary to make the non-GAAP EBITDA and Free Cash Flow projections included in the Proxy not misleading. Indeed, the Defendants acknowledge that disclosing non-GAAP projections may mislead shareholders in the Proxy: "[N]on-GAAP financial measures are not determined consistently by all companies, the non-GAAP measures presented in these Company financial projections may not be comparable to similarly-titled measures of other companies... EBITDA and free cash flow projections are not calculated in accordance with US GAAP and should not be considered substitutes for

comparable GAAP measures, such as net income and net cash provided by operating activities" Proxy 76.

35.    The Proxy also fails to disclose the unlevered free cash flows[6] that both ADMA and the post-Transaction combined company ("New ADMA") are forecasted to generate during ADMA's fiscal year 2017 through fiscal year 2031 and 2017 through 2026, respectively. Proxy 80-81. Under sound corporate finance theory, ADMA shareholders would find such cash flow projections material in assessing the fairness of the Proposed Transaction. Indeed, when stockholders must vote on a transaction that will significantly dilute their ownership stake, information regarding the financial attractiveness of the deal is of particular importance.    This is because the stockholders must measure the relative attractiveness of retaining their current equity stake versus giving up equity in exchange for new assets, a calculus heavily dependent on the stockholders' assessment of the company's future cash flows.  The omission of the cash flow projections renders the projections set forth on page 76 of the Proxy, as well as the summary of Raymond James' Discounted Cash Flow Analysis on pages 80-81, materially incomplete and misleading.  If a proxy discloses projections, such projections must be complete and accurate.

---

[6] A different financial metric than the Free Cash Flow measure referenced on page 76 of the Proxy.

36.     Indeed, financial experts agree that projections for EBITDA, which are included in the Proxy, are not a sufficient substitute for unlevered free cash flow projections when attempting to understand the value of a company.  As Warren Buffet and other financial experts have stated: "References to EBITDA make us shudder. Too many investors focus on earnings before interest, taxes, depreciation and amortization.     That makes sense, only if you think capital expenditures are funded by the tooth fairy."[7]

37.     Relying solely on EBITDA to provide a fair summary of a company's financial prospects has numerous pitfalls.  EBITDA does not take into account any capital expenditures, working capital requirements, current debt payments, taxes, or other fixed costs which are critical to understanding a company's value.  As a result of these material differences between EBITDA and unlevered free cash flow, many analysts recognize unlevered free cash flow as a much more accurate measure when it comes to analyzing the expected performance of a company. Disclosing EBITDA projections without cash flow projections is therefore inherently misleading.

38.     The Proxy also omits certain key inputs necessary for shareholders to assess the valuation analyses performed by Raymond James in support of its

---

[7]     Elizabeth MacDonald, *The Ebitda folly*, FORBES   (March   17,   2003), http://www.forbes.com/global/2003/0317/024.html.

fairness opinion, rendering the summaries of such analyses in the Proxy incomplete and misleading.

39.    With respect to Raymond James' Discounted Cash Flow Analysis, the Proxy fails to disclose the inputs and assumptions underlying the calculation of the discount rate ranges used by Raymond James. This information is particularly important given the divergent discount rate ranges Raymond James applied for its ADMA Discounted Cash Flow Analysis (10.7% to 13.1%) as compared to its New ADMA Discounted Cash Flow Analysis (9.6% to 11.7%).

40.    These key inputs are material to ADMA shareholders, and their omission renders the summary of Raymond James' Discounted Cash Flow Analysis on pages 80-81 of the Proxy incomplete and misleading. As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value..." *Id.* As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of

> dollars can change the discounted cash flow value by tens
> if not hundreds of millions of dollars....This issue arises
> not only with a discounted cash flow analysis, but with
> each of the other valuation techniques. This dazzling
> variability makes it difficult to rely, compare, or analyze
> the valuations underlying a fairness opinion unless full
> disclosure is made of the various inputs in the valuation
> process, the weight assigned for each, and the rationale
> underlying these choices. The substantial discretion and
> lack of guidelines and standards also makes the process
> vulnerable to manipulation to arrive at the "right" answer
> for fairness. This raises a further dilemma in light of the
> conflicted nature of the investment banks who often
> provide these opinions. *Id.* at 1577-78.

41. With respect to Raymond James' Selected Companies Analyses (Proxy 79-80), the Proxy fails to disclose the individual multiples Raymond James calculated for each company utilized. The omission of the individual multiples for each company renders the summary of these analyses and the implied equity values set forth on pages 79-80 of the Proxy materially misleading. A fair summary of a Selected Companies Analysis requires the disclosure of the individual multiples for each company; merely providing the range that a banker applied is insufficient, as shareholders are unable to assess whether the banker applied appropriate multiples, or, instead, applied unreasonably low multiples in order to drive down the implied share price ranges.

42. The Proxy also fails to disclose material information regarding a conflict of interest Raymond James faced. Specifically, while the Proxy notes that Raymond James has provided financial advisory services to ADMA during the past

two years for "which it has been paid a fee," the Proxy fails to *quantify* the amount of fees Raymond James has received for such work. This information must be disclosed pursuant to 17 C.F.R. § 229.1015(b)(4), which requires disclosure of "any compensation received or to be received as a result of the relationship between" a financial advisor and the subject company or its affiliates.

43.    Such information is also material to ADMA shareholders. Indeed, it is imperative for shareholders to be able to understand what factors might influence the financial advisor's analytical efforts. A financial advisor's own proprietary financial interest in a proposed transaction must be carefully considered in assessing how much credence to give its analysis. A reasonable shareholder would want to know an important economic motivation of the advisor employed by a board to assess the fairness of the transaction to shareholders. It is not only the amount and nature of a contingent fee that is relevant to an investment bank's interest in a transaction. The relationships between investment banks and corporate management can run deep, and an investment bank often has business with the corporation and its management that spans more than one transaction. Where an investment bank is providing a fairness opinion for long-standing clients, it may be influenced to find a transaction fair to avoid irritating management and other corporate actors who stand to benefit from the transaction, as this will ensure future lucrative business. The omission of how much in fees Raymond James has

been paid for its prior work for ADMA renders the vague statement on page 82 of the Proxy that Raymond James "has been paid a fee" incomplete and therefore misleading, as shareholders have no way to assess the significance of such fees.

44. The Proxy also notes that the Individual Defendants received a Real Property Appraisal Report dated October 26, 2016 for the Boca Facility (the "Appraisal Report"), which Raymond James specifically reviewed in connection with preparing its fairness opinion. Proxy 78. However, the Proxy fails to disclose any specifics regarding the value of the Boca Facility set forth in the Appraisal Report, and instead only refers to a $20 million value of the property based upon an appraisal conducted at least two years earlier. Proxy 150. Given that the Boca Facility is one of the "core" assets the Company stands to acquire in the Proposed Transaction, shareholders would undoubtedly find the most recent appraisal value of the Boca Facility material in connection with deciding how to vote on the deal. The omission of the Boca Facility's most recent appraisal value renders the vague reference to the Appraisal Report and the reference to the Boca Facility's outdated $20 million value misleading.

45. Defendants have also failed to *quantify* the "significant synergies" they expect the Proposed Transaction to result in. The Board specifically considered the "potential synergies" at its September 9, 2016 meeting (Proxy 57), and Defendants are touting the potential "significant synergies" as a primary

reason why ADMA shareholders should support the Proposed Transaction. *Id.* at

61. Shareholders would undoutbeldy find management's best estimate of the

anticipated "significant synergies" to be material information, and the omission of

such information renders the vague references to the "significant synergies" on

pages 57 and 61 of the Proxy incomplete and misleading.

46. Defendants have also omitted material information regarding a

significant "risk related to the Transaction." Proxy 17. Specifically, the Proxy

notes that:

> [O]n December 20, 2016, the BPC Therapy Business
> Unit received notice from one of its contract fillers
> stating that the manufacturing services agreement with
> such contract filler had expired and *will need to be
> renegotiated prior to April 1, 2017 to avoid any
> interruption in the services provided under the
> agreement*. The services provided under this agreement
> relate to the filling and packaging of Nabi-HB® and
> BIVIGAM®, two of the revenue-generating plasma-
> derived products for which we have agreed to acquire all
> associated commercial rights in connection with the
> Transaction. *This vendor is the only provider of this
> service currently approved by the FDA to fill and
> package these products. The BPC Therapy Business Unit
> disagrees with the vendor's interpretation of the
> expiration of the contract and believes that the
> agreement remains in effect. However, in the event that
> we or the BPC Therapy Business Unit are required to
> negotiate a new agreement, the terms of such new
> agreement may not be as favorable to ADMA as the
> current agreement and there can be no assurances that a
> new agreement will be reached, which, in each case,
> could have a material adverse effect on our Company.*

This description regarding the status of this key manufacturing services agreement is identical to the one Defendants included in the preliminary proxy statement filed with the SEC on March 15, 2017. However, Defendants have failed to provide any update regarding the current status of the manufacturing services agreement, despite the fact that the April 1, 2017 deadline the contract filler set for renegotiating the agreement passed one month ago and there is thus undoubtedly new information regarding the status of the agreement and/or negotiations with the contract filler that ADMA shareholders would find material. This information is particularly material given that the vendor is the *only* provider of this necessary service approved by the FDA. The omission of such information renders the above-quoted vague description regarding the status of the manufacturing services agreement incomplete and therefore misleading.

47. In sum, the omission of the above-referenced information renders statements in the Proxy materially incomplete and misleading, in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the shareholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

### (Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9, 17 C.F.R. § 244.100, and 17 C.F.R. § 229.1015(b)(4) Promulgated Thereunder)

48.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

49.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

50.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

51.     SEC Regulation G has two requirements: (1) a general disclosure requirement; and (2) a reconciliation requirement.    The general disclosure

requirement prohibits "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure, contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure...not misleading.*" 17 C.F.R. § 244.100(b). The reconciliation requirement requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure. 17 C.F.R. § 244.100(a). As set forth above, the Proxy omits information required by SEC Regulation G, 17 C.F.R. § 244.100.

52. 17 C.F.R. § 229.1015(b)(4) requires disclosure of "any compensation received or to be received as a result of the relationship between" a financial advisor and the subject company or its affiliates.

53. The omission of information from a proxy statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

54. Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Transaction. Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) financial projections for

the Company; (ii) valuation information regarding the core assets ADMA will acquire if the Proposed Transaction is consummated; and (iii) the valuation analyses performed by Raymond James.

55.    In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

56.    The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that Raymond James reviewed and discussed its financial analyses with the Board, and further states that the Board considered both the financial analyses provided by Raymond James as well as its fairness opinion and the assumptions

made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and knew or should have known of the conflicts faced by Raymond James.

57.     The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.     Indeed, the Individual Defendants were required to review Raymond James' analyses in connection with their receipt of the fairness opinion, question Raymond James as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

58.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Purchase

Agreement and the preparation of the Company's financial projections.

59. ADMA is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

60. The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

61. Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

### (Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)

62. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

63. The Individual Defendants acted as controlling persons of ADMA within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of ADMA, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC,

they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

64. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

65. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

66. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Purchase Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The

Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

67. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

68. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

69. Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B. Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Transaction or

consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.     Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

E.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: May 1, 2017                    Respectfully submitted,

**MONTEVERDE & ASSOCIATES PC**

By: _____

Miles D. Schreiner, Esq.
SBN 910082012
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
Email:mschreiner@monteverdelaw.com

*Counsel for Plaintiff*

# EXHIBIT A

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, ___Jonathan English___ ("Plaintiff"), declare, as to the claims asserted

under the federal securities laws, that:

1.  Plaintiff has reviewed a draft of the complaint and has authorized the filing of a complaint substantially similar to the one reviewed.

2.  Plaintiff selects Monteverde & Associates PC and any firm with which it affiliates for the purpose of prosecuting this action as my counsel for purposes of prosecuting my claim against defendants.

3.  Plaintiff did not purchase the security that is the subject of the complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4.  Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5.  Plaintiff sets forth in the attached chart all the transactions in the security that is the subject of the complaint during the class period specified in the complaint.

6.  In the past three years, Plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws, unless otherwise specified below.

7.  Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

    I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.

Signed this 29 day of April, 2017.

_____
Signature

| Company Name/Ticker | Transaction (Purchase or Sale) | Trade Date | Quantity |
|---|---|---|---|
| ADMA | Purchase | 7/21/16 | 250 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |